UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MICHAEL L. FOGLE, ) | |
| ) | |
| Plaintiff(s), ) | |
| ) | |
| vs. ) | Case No. 4:06CV00227-ERW |
| ) | |
| MARTHA BELLOW-SMITH, et al., ) | |
| ) | |
| Defendant(s). ) | |

## **MEMORANDUM AND ORDER**

This matter comes before the Court on Defendants Martha Bellow-Smith and Deanna "Dee" Wolf's Motion for Summary Judgment [doc. #16].

## **I. FACTUAL BACKGROUND**[1]

Plaintiff is currently housed in the Missouri Sexual Offender Treatment Center ("MSOTC"), where he is being detained as a civil detainee.[2] In July, 2005, the Plaintiff was sent

---

[1]The Court's recitation of the facts is taken from both Defendants' statement of uncontroverted material facts, and Plaintiff's response to Defendants' statement. In Defendants' reply memorandum, Defendants assert that Defendants' statement of the facts should be accepted as true, because Plaintiff failed to comply with the local rules by failing to file a separate statement of controverted material facts. The Court recognizes the importance of the local rules, as they assure that issues are presented before the court in an orderly and concise manner. Plaintiff is pro se. Plaintiff did list his objections to the Defendants' statements in his response in opposition. The Court will exercise discretion and allow Plaintiff to incorporate his factual disputes in its recitation.

[2]Missouri's Sexually Violent Predator Act ("SVPA") authorizes the civil commitment of sexually violent predators, as determined by a court, in a secure facility determined by the department of mental health. Mo.Rev.Stat. § 632.484.2. A sexually violent predator is defined as:

> (5) any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined

1

two calling cards in the mail from his father. On the same day that Plaintiff received the two calling cards, a fellow resident also received a calling card. A MSOTC staff member noted similarities between the envelopes received by Plaintiff and the fellow resident; specifically, the penmanship on the two envelopes was similar, they both originated on the same date and were postmarked Houston, Texas. Upon investigation, Defendant Deeana Wolf, a psychologist formerly employed as the clinical lead at MSOTC, concluded that the fellow resident's calling card was sent from Plaintiff's father, which is contrary to MSOTC policy.[3] Plaintiff disputes that there was sufficient evidence to conclude that the fellow resident's calling card was sent from Plaintiff's father. As a result of the alleged violation, Defendant Wolf confiscated the two calling cards received by Plaintiff, this occurred on July 12, 2005. A second incident involving a calling card occurred on July 15, 2005. Plaintiff asked to make a phone call using a phone card that he had previously received from his parents.[4] When the number on the calling card was dialed by a

---

      in a secure facility and who: (a) has pled guilty or been found guilty, or been found not guilty by reason of mental disease or defect pursuant to section 552.030, RSMo, of a sexually violent offense; or (b) has been committed as a criminal sexual psychopath pursuant to section 632.475 and statutes in effect before August 13, 1980.

Mo.Rev.Stat. § 632.480.(5)(a)-(b).

   [3]The MSOTC Policy states:

   There will be no sexual contact between or among residents. Additionally, there will be no borrowing, lending, trading, selling, bartering, gifts or purchasing for one resident by another resident or other resident's family. All residents have been convicted of at least one sex offense. Such unauthorized exchanges are a part of grooming behavior that is part of the sexual offense cycle. Such behaviors are not therapeutic and may contribute to the continuation of victimization or criminal behavior.

*Defs. Memo. in Supp. of Defs. Mot. for Summ. Judg.*, Ex. D.

   [4]The procedure for placing a phone call was outlined by Plaintiff in his deposition. When a resident receives a calling card, the card is logged by staff members and the numbers recorded.

2

staff member, it was discovered that it was the number for a "sex line," and not an ordinary calling card. Following these two incidents, Defendant Martha Bellew-Smith, entered a "read order" for all of Plaintiff's mail, dated July 17, 2007. Defendants assert that the "read order" was required in order to prevent communications that may be contrary to MSOTC's therapeutic goals. Defendants further assert that Plaintiff's legal mail was examined for contraband, but not read; only Plaintiff's non-legal mail was read.

Plaintiff largely agrees with the above recitation, with a few discrepancies. Plaintiff asserts that when the "read order" was first initiated, the only mail that was not read was communications to his criminal counsel. Plaintiff asserts that other legal mail regarding the pending lawsuit, and another civil suit, were subject to the read order. Plaintiff stated in his deposition that at some point this was changed so that all legal mail was sent without being read. Plaintiff asserts that the "read order" resulted in delays of a week to two weeks in his mail being sent out or received. Plaintiff further asserts that on one occasion he did not receive a letter from his attorney for over one month. Plaintiff asserts that his mail is still subject to the "read-order," and that although some delays have been alleviated, there is still an unreasonable delay in the receipt and sending of mail.

## II. PROCEDURAL HISTORY

Plaintiff filed suit under 28 U.S.C. § 1983 against Defendants, alleging violations of his rights under the First and Fourteenth Amendments to the United States Constitution. Specifically, Plaintiff asserts that the confiscation of the two phone cards by Defendant Wolf violated his Fourteenth Amendment right to due process, and the "read order" violates his right to free speech

---

When a resident wishes to place a call, a staff member places the call using the numbers logged.

under the First Amendment. The Defendants have filed a motion for summary judgment on both counts of Plaintiff's complaint, and the Court will now address that motion.

### III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Citrate*, 477 U.S. 317, 322 (1986). The United States Supreme Court has noted that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (quoting Fed. R. Civ. P. 1). "By its terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one such that "a reasonable jury could return a verdict for the nonmoving party." *Id*. Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th

Cir. 1988). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 249. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). To meet its burden, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the non-moving party must show there is sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 324. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

## IV. DISCUSSION

Plaintiff alleges that he is entitled to relief under 42 U.S.C. § 1983.[5] Section 1983 is "merely a vehicle for seeking a federal remedy for violations of federally protected rights. *Foster v. Wyrick*, 823 F.2d 218, 221 (8th Cir. 1987). To determine whether a violation occurred, two essential elements must be present: 1) the conduct complained of was committed by a person acting under color of state law; and 2) the conduct complained of deprived a plaintiff of rights,

---

[5] 42 U.S.C. § 1983 states:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State. . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . ..

privileges, or immunities secured by the Constitution or laws of the United States. *DuBose v. Kelly*, 187 F.3d 999, 1002 (8th Cir. 1999). There is no question that both Defendants were employees of the state, and that the actions complained of were done under color of state law. Therefore, the Court will focus its discussion on the second requirement; whether the conduct complained of deprived Plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States.

### A. QUALIFIED IMMUNITY

Defendants assert that they are entitled to qualified immunity, as Plaintiff cannot show that the Defendants' alleged acts violated clearly established federal law. "Government officials performing discretionary functions are shielded from liability for civil damages in § 1983 actions unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Foulks v. Cole County, Missouri*, 991 F.2d 454, 456 (8th Cir. 1993) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Supreme Court has described qualified immunity as comprised of both a subjective and objective element. *Harlow*, 457 U.S. at 815. Stating these requirements in the negative, the Supreme Court held that "qualified immunity would be defeated if an official *knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff, *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury." *Id.* (emphasis in original) (internal quotation omitted). The Eighth Circuit has articulated a two part inquiry in determining whether a defendant's actions, taken within the sphere of official responsibility, are protected by qualified immunity. *Ware v. Morrison*, 276 F.3d 385, 387 (8th Cir. 2002). "First we must inquire whether the facts alleged, when taken in the light most favorable to the party asserting the injury, show that the defendant

6

officials violated a constitutional right. If we determine that the plaintiff has shown a violation of a constitutional right, we then must inquire whether the constitutional right was clearly established." *Id.*

### 1. Fourteenth Amendment Due Process Violation

As stated above, the first inquiry to be made by this Court is whether the facts alleged violated a constitutional right. The Court will first address Plaintiff's allegation that the confiscation of the two phone cards, on July 12, 2005, constituted a deprivation of property without due process of law. Defendants argue that there was no violation of Plaintiff's Fourteenth Amendment rights, because under Supreme Court jurisprudence, the decisions of treating professionals are entitled to a presumption of correctness.

Before addressing whether there was a due process violation, the Court must determine the standard to be used. Plaintiff is not a convicted inmate, but rather is being detained pending the outcome of a court case to determine whether he should be civilly committed under the SVPA. The Eighth Circuit held, in *Revels v. Vincenz*, that "an involuntarily committed psychiatric patient is confined for purposes of treatment rather than incarcerated for the purpose of punishment following conviction." 382 F.3d 870, 874 (8th Cir. 2004). Furthermore, an involuntarily committed patient is subject to the same safety and security concerns as those of a prisoner. *Bradford v. Blake*, 2006 WL 744307, *4 (E.D.Mo. 2006) (citing *Revels*, 382 F.3d at 875). In accordance with the above classification of civilly committed individuals, the Court will use the same standard as that annunciated by the Supreme Court in *Bell v. Wolfish* for analyzing the claims of pretrial detainees. 441 U.S. 520, 535 (1979). The Supreme Court stated that "there must be a mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.* at 546. Specifically "maintaining

institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.*

Having determined the applicable standard of review, the Court must next determine whether the Plaintiff had a property interest in his two phone cards that is protected by the due process clause.[6] The Eighth Circuit has held on numerous occasions that inmates have a property interest in money that is sent to them from an outside source. *Mahers v. Halford*, 76 F.3d 951, 954 (8th Cir. 1996) ("We agree with the district court that inmates have a property interest in money received from outside sources."); *see also Parrish v. Mallinger*, 133 F.3d 612, 614 (8th Cir. 1998) ("Defendants concede, as they must, that Parrish [plaintiff] has a property interest in the money his mother sent him that is protected by the Due Process Clause of the Fourteenth Amendment."). The Court finds these cases analogous to the case at bar. While Plaintiff did not receive money from his family, he did receive phone cards which could then be used to make phone calls, which would otherwise be unavailable. The Court concludes that Plaintiff had a property interest in the two phone cards that were seized by MSOTC personnel.

Plaintiff is challenging the procedure that was undertaken in depriving Plaintiff of his property. Specifically, Plaintiff stated in his deposition that he was not shown any proof that he caused the fellow resident to receive a phone card, and was not given an opportunity to challenge this determination. *Pl. Depo.*, p. 13, line 4-13. The deprivation of property is actionable under § 1983, "without regard to whether the same deprivation would have taken place even in the

---

[6]Defendants do not address whether there was a property interest in the two phone cards, but rather argue that deference is to be given to decisions made by treating professionals. *Defs. Memo. in Support of Defs.' Mot. for Summ. Judg.*, p. 10. This Court need only address the reasonableness of the process Plaintiff received once it has been determined that there was a protected property interest.

presence of proper procedural safeguards." *Zinermon v. Burch*, 494 U.S. 113, 126 n.11 (1990) (citing *Carey v. Piphus*, 435 U.S. 247, 266 (1978)). "A procedural due process claim focuses not on the merits of a deprivation, but on whether the State circumscribed the deprivation with constitutionally adequate procedures." *Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998). "This inquiry examines 'the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.'" *Id.* (citing *Zinermon*, 494 U.S. at 126).[7] The court in *Parrish*, goes on to list a number of relevant factors in determining what procedural safeguards are required, including: "the affected private interest, the risk of an erroneous deprivation, the probable value of additional procedural safeguards, and the government's interest, including burdens that additional safeguards would entail." 133 F.3d at 615. The solution to the question, what process is due, in most cases, requires some type of predeprivation notice and hearing, however, this is not always required. *Id.* "Due process . . . is a flexible concept that varies with the particular situation." *Zinermon*, 494 U.S. at 127.

The Defendants' arguments are focused on the last factor listed by the Eighth Circuit, namely, the government interest in controlling treatment decisions of civilly committed residents. Defendants argue that due to the latitude given to treating staff members, the procedure used to confiscate the calling cards was sufficient, and did not violate the due process clause. Clearly the Government has an interest in the effective control of a mental facility such as MSOTC, which requires the implementation of rules and regulations that may impact the constitutional rights of

---

[7]It is therefore unnecessary for the Court to address whether Defendants were justified in depriving Plaintiff of his calling cards.

residents.⁸ *See Bell,* 441 U.S. at 546. Although *Bell* was addressing the Fourteenth Amendment in the context of liberty interests, the same concerns of safety and security are present in an analysis regarding property interests. *Id.*

The Court notes that no process was provided in the case at bar prior to the confiscation of Plaintiff's two phone cards. Furthermore, no evidence has been provided to show that a hearing, or some other predeprivation process, would have been adverse to the safety and security of MSOTC.⁹ The Supreme Court in *Hudson v. Palmer*, held that no predeprivation process is necessary when a prisoner's property is sized because such predeprivation procedure is impracticable. 468 U.S. 533. 517, (1984). The Supreme Court acknowledges that in the context of prison administration, "routine shakedowns of prison cells are essential to the effective administration of prisons[,]" and that the destruction of property following such an act, even if wrongful, cannot be subject to predeprivation procedure. *Id.* at 529-32 ("It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place."

---

⁸The Defendants focus the Court's attention on the case of *Youngberg v. Romeo*, which holds that "the Constitution only requires that the courts make certain that professional judgment was in fact exercised." 457 U.S. 307, 321 (1982). However, that case addressed the substantive due process rights of the civilly committed, not the procedural rights, and therefore its instructiveness is limited. *Id.* at 315 ("We consider here for the first time the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment of the Constitution.").

⁹The only post-deprivation process available to Plaintiff would have been under Missouri tort law, however, the success of such an action is dubious. *See e.g. Nitcher v. Thompson*, 777 S.W.2d 626, 627 (Mo.Ct.App. 1989) ("Public officials . . . may be held liable for torts committed when acting in ministerial capacity."); *see also Harris v. Munoz*, 43 S.W.3d 384, 387-88 (Mo.Ct. App. 2001 (Describing ministerial function as "one that a public offender is required to perform upon a give state of facts, in prescribed manner, in obedience to the mandate of legal authority, without regard to the officer's own judgment or opinion concerning the propriety of the act." (internal citation omitted)). The actions by Defendants in this case would likely be classified as discretionary, and therefore Plaintiff would be without recourse under Missouri Tort law. However, even assuming that such a remedy were available, the Court finds nonetheless that the process provided was insufficient.

(internal citation omitted)). The Supreme Court stated, "we hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy is available." *Id.* at 533. Specifically, the Supreme Court found that post-deprivation procedure is sufficient where there are adequate state tort law remedies for the improper taking of property. *Id.* However, the case at bar is distinguishable from *Hudson* on a number of grounds. The case at bar does not involve a prisoner, nor was there an immediate safety concern. *Id.* at 534.

*Hudson* is instructive, in that it demonstrates the flexibility in the Due Process Clause to tailor the required process to the legitimate government interests. There are a number of factors that the Court considers in determining the required process in the case at bar: 1) Plaintiff's status as a civil detainee; 2) the relative lack of safety concerns that Plaintiff posed; and 3) the MSOTC regulations which forbade Plaintiff's conduct and led to the confiscation. The Court finds that in the case at bar, considering these factors, some additional procedure was required before Plaintiff's property could be confiscated. The only evidence provided by Defendants in support of immediate confiscation was a copy of Plaintiff's treatment notes which stated that the two cards were being held as evidence. *See Defs. Memo. in Supp. of Defs. Mot. for Summ. Judg.*, Ex. C. There is insufficient evidence, as a matter of law, to support judgment in favor of Defendants based on Defendants' claim, that the process provided to Plaintiff, was sufficient to support the confiscation of Plaintiff's property.

Under the doctrine of qualified immunity, once the Court has determined that there is sufficient evidence to support a jury finding that the actions of the Defendants violated Plaintiff's constitutional rights, the Court must determine whether that right was clearly established. *Ware*, 276 F.3d at 387. "[G]overnment officials performing discretionary functions generally are

shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights *of which a reasonable person would have known.*" *Harlow*, 457 U.S. 818 (emphasis added). Thus, the actions of the Defendants in depriving Plaintiff of his property without due process of law must be judged by the objective reasonableness of the official's conduct. *Id.* "If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.* "A defendant will be entitled to qualified immunity if either (1) his actions did not violate clearly established law or (2) it was objectively reasonable for him to believe that his actions did not violate clearly established law." *Iqbal v. Hasty*, 490 F.3d 143, 152 (2nd Cir. 2007).

"In determining whether a right was clearly established, the court must assess whether the contours of the rights were sufficiently clear in the context of the alleged violation such that a reasonable official would understand that what he was doing violated that right." *Iqbal*, 490 F.3d at 152 (internal citation omitted). The Supreme Court precedent, as well as Eighth Circuit precedent, clearly establishes that an individual who is confined to the custody of the state, is entitled to some due process, either before or after an individual property is confiscated. *See e.g. Hudson*, 468 U.S. at 517; *see also Parrish*, 133 F.3d at 615. However,

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Parrish*, 133 F.3d at 616 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). It is clearly established, under Eighth Circuit and Supreme Court precedent, that some procedure was required to ensure that Plaintiff was not improperly deprived of his property, however, the

contours of the procedure that was due is not entirely clear. Due to the confusing nature of Plaintiff's status as a civil detainee, and the legitimate government interest in treating the detainees of MSOTC, the Court finds that the law was not clearly established. Although, under the facts of the case at bar, the Court believes that the process provided was insufficient, the Court also believes that Defendants were reasonable in thinking that their actions did not violate clearly established law. *Iqbal*, 490 F.3d at 152. Therefore, the Defendants are entitled to summary judgment on the basis of qualified immunity.

### 2. First Amendment Free Speech Violation

As stated above, the first inquiry to be made by this Court under a qualified immunity analysis, is whether the evidence, taken in a light most favorable to the plaintiff, shows a violation of a constitutional right. *Ware*, 276 F.3d at 387. The Court will now address whether the "read order" imposed on Plaintiff violated his constitutional rights under the First Amendment of the United States Constitution. The "read order" requires all of Plaintiff's non-legal mail to be submitted to the team,[10] where it is reviewed for content, prior to being delivered to Plaintiff or being sent out in the mail. There is a slight factual dispute over the treatment of Plaintiff's legal mail. Both parties agree that Plaintiff's correspondence with the public defender was not subject to the read order, but rather was checked for contraband by a staff member, and then sealed by Plaintiff before being delivered, and a similar procedure was used for incoming legal correspondence.[11] However, Plaintiff asserts that other legal correspondence[12] was subject to the

---

[10]This references a treatment team, which meets once a week, and at that time reviews Plaintiff's incoming and outgoing mail.

[11]All mail received at MSOTC was opened and checked for contraband, so the procedure used on Plaintiff's incoming legal mail was not unusual.

[12]It is not clear what communications this would include, as Plaintiff is not represented by Counsel in either of the two civil proceedings in which he is a party. In Plaintiff's deposition, he

13

"read order." Plaintiff has not provided any evidence in support of this assertion, and therefore, the Court will analyze the issue based on Defendants' evidence that Plaintiff's legal mail was not subject to the "read order." *See Defs. Memo. in Support of Defs. Mot. for Summ. Judg.*, Ex. C. The "read order" was implemented following the incident involving the "sex card." The evidence provided by Defendants supports Defendants' position that the "sex card" incident in conjunction with the earlier calling card incident required further monitoring of Plaintiff's mail, to ensure that there was no sexual content that would interfere with the therapeutic objectives of MSOTC. Plaintiff also asserts that his First Amendment rights were violated due to the delay that was caused by the "read order." Specifically, Plaintiff asserts that on at least one occasion his correspondence with his attorney was delayed by a month, and all his correspondence was delayed by a week to two weeks.

The First Amendment[13] clearly protects Plaintiff's confidential communications between himself and his counsel of record. *See Foster v. Helling*, 210 F.3d 378, 378 (8th Cir. 2000) ("Prisoners retain their First Amendment rights of sending and receiving mail, and prison officials may not read inmates' legal mail." (citing *Thongvanh v. Thalacker*, 17 F.3d 256, 258-59 (8th Cir. 1994)); *see also O'Lane v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) ("Inmates clearly retain protections afforded by the First Amendment."). Although these cases address inmates, the

---

references materials that are sent to the Court relating to the pending case.

[13]The First Amendment states:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. CONST. amend. I.

standard would not be lower for civil detainees, who are generally subject to a higher level of protection. The evidence supports the Defendants' assertion that Plaintiff's legal mail was not being read, but rather only being checked for contraband, and therefore there is no evidence to support a constitutional violation on this basis. However, it is less clear whether Plaintiff has a right to correspond free from scrutiny, regarding non-legal mail, as well as whether there was a violation due to the delay caused by the "read order." The Court will address each of these two questions, in turn.

The legality of actions involving incoming and outgoing mail turns on the question, "[i]s the regulation reasonably related to a legitimate penological interest?" *Thongvanh*, 17 F.3d at 259. Although the case at bar does not involve a prison, the considerations enumerated by the Eighth Circuit in *Thongvanh*, are applicable in the context of a civil detainee; the Court is mindful that in determining the legitimacy of the state interest, the classification of the Plaintiff is significant. The Eighth Circuit has enumerated four factors to be considered:

> (1) whether there is a valid rational connection between the regulation and the legitimate government interest it purports to further; (2) whether the inmate has an alternative means of exercising his constitutional right; (3) the impact that accommodation of the inmate's right would have upon others, including inmates as well as non-inmates; and (4) the absence of a ready alternative to the regulation.

*Id.* (citing *Turner v. Safley*, 482 U.S. 78 (1987)). In the context of Plaintiff's First Amendment claim, the case of *Youngberg*, is applicable, as it gives a perspective from which to assess the legitimate government interest. 457 U.S. 307 (Involving civil commitment under the laws of Pennsylvania.). The Supreme Court in *Youngberg* stated that "it is necessary to balance the liberty of the individual and the demands of an organized society." *Id.* at 320. The role of this Court is to assess whether the restraint that was imposed was the result of professional judgment;

15

a closer inquiry "would restrict unnecessarily the exercise of professional judgment as to the needs of residents." *Id.* at 322.

Applying these standards to the case at bar, the Court finds that Plaintiff's First Amendment rights were not violated as a result of the "read-order." The Defendants were careful to protect Plaintiff's right to communicate privately with his attorney, and applied the "read-order" only to Plaintiff's non-legal mail. *Defs. Memo. in Supp. of Defs. Mot. for Summ. Judg.*, Ex. c, p. 2. Furthermore, Defendants have stated a legitimate government interest in reviewing Plaintiff's non-legal mail, to ensure that Plaintiff did not continue to violate the rules regarding phone cards. The Court is not in a position to second guess the professional judgment of MSOTC personnel, as they are in a position to determine the best course of treatment for Plaintiff. The Plaintiff was still permitted to communicate by mail with family and friends, and although he testified that he believed he could not say all that he wished in his communications because of the "read-order," there was no testimony by Plaintiff that he was specifically prevented from communicating. The Court recognizes that the "read-order" had an effect on Plaintiff's right to communication under the First Amendment, however, the reason for the "read-order" articulated by Defendants, is a legitimate government objective which outweighs the Plaintiff's right to send and receive all private communications. The same analysis is applicable to Plaintiff's assertion that the "read order" caused a delay in his communications. These delays are inherent in the Government's need to review Plaintiff's mail to ensure compliance with facility regulations, and further the government's treatment objectives. Plaintiff has not provided evidence that Defendants acted in bad faith in enforcing the "read order.[14]" Such read-orders have frequently

---

[14]It is undisputed that the delays in Plaintiff's incoming and outgoing mail were caused by the infrequency of the team's meetings. The team which was to review Plaintiff's mail only convened once a week.

16

been recognized in prison cases, and the Court believes that the treatment objectives of MSOTC are comparable to the safety concerns of prisons. *See e.g. Thongvanh*, 17 F.3d at 259 ("[P]rison officials have a duty to maintain security within the prison, and this may include reading inmates' incoming and outgoing mail . . .."); *see also Procunier v. Martinez*, 416 U.S. 396, 413 (1974) ("[T]he legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence."). Since the Court finds that Plaintiff has failed to provide sufficient evidence to support a claim under the First Amendment it is unnecessary to address the second step of the qualified immunity analysis. Therefore, Defendants' motion for summary judgment on Plaintiff's First Amendment claim is granted.

## V. CONCLUSION

The Court concludes that Plaintiff has presented evidence sufficient to support a finding in his favor that his right to procedural due process under the Fourteenth Amendment of the Constitution was violated when Defendants' failed to provide any predeprivation or post-deprivation procedure before confiscating two phone cards that Plaintiff received from a family member. However, the Court does not believe that this right was clearly established, to be sufficient to defeat the Defendants' right to qualified immunity. Therefore, Plaintiff's claim against Defendants for violation of his procedural due process right is barred by qualified immunity. Additionally, Defendants are entitled to summary judgment on Plaintiff's First Amendment claim, as Plaintiff has failed to provide sufficient evidence to support a jury verdict in his favor. The evidence clearly shows that only Plaintiff's non-legal mail was subject to the "read order," and that the "read-order" was based on a legitimate government interest, namely the treatment goals of MSOTC.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [doc. #16] is **GRANTED.**

Dated this 30th Day of August, 2007.

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE